# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                    No. CR 08-1012 JB

NATHAN EDWIN MARTIN,

      Defendant.


## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the United States' Motion to Return Defendant for Evaluation to Determine Sexual Dangerousness, filed November 18, 2010 (Doc. 50); and (ii) the United States' Motion for a Second Evaluation Pursuant to 18 U.S.C. § 4246, and in the Alternative, for an Evaluation Pursuant to 18 U.S.C. § 4248, filed July 12, 2011 (Doc. 57)("Motion").  The Court held a hearing on the Plaintiff United States of America's first motion on November 30, 2010 and held a hearing on the United States' second motion on August 31, 2011. The primary issues are: (i) whether the Court should authorize a second examination of Defendant Nathan Martin under 18 U.S.C. § 4246; (ii) whether the Court should authorize an examination of Martin for sexual dangerousness under 18 U.S.C. § 4248; and (iii) where an additional evaluation of Martin should take place.  The Court will grant the first motion and grant the second motion in part and deny the second motion in part.  The Court will not authorize a second examination of Martin under 18 U.S.C. § 4246, but will allow an examination of Martin under 18 U.S.C. § 4248. The Court recommends that the evaluation under 18 U.S.C. § 4248 take place at the Springfield, Missouri Bureau of Prisons facility.  The commitment period for examination must last for only a

reasonable period of time, not to exceed forty-five days.

## FACTUAL BACKGROUND

The United States alleges that, on the morning of December 3, 2007, Martin raped twenty-four year-old E.P. by a sheep camp near Zuni, New Mexico while she was evaluating the health of range land in the area.  See Motion at 1.  The United States contends that, while E.P. was working, Martin came up and began talking with her.  See Motion at 2.  The United States alleges that, rather than letting E.P. return to work, Martin attacked her and began raping her.  See Motion at 2.  The United States alleges that after she attempted to fight off Martin, he began to beat her, kicking her several times with his boots after tackling her, and at one point picking up a stick and beating her with it.  See Motion at 2.  Regarding the specifics of the rape, the United States contends that Martin first inserted his finger into E.P.'s vagina.  See Motion at 2.  He then allegedly began kissing her neck, lifted up her shirt, and kissed her right breast.  See Motion at 2.  Afterwards, the United States alleges, Martin penetrated her vagina with his penis, and eventually pulled out his penis and ejaculated on the ground.  See Motion at 2.  Then, the United States contends, he reinserted his penis inside of her vagina again and continued to lie on top of E.P., pinning her to the ground with his weight.  See Motion at 2.

Law enforcement photographed the injuries E.P. allegedly sustained.  See Motion at 3.  E.P.'s physical description of her assailant allegedly matches the description of Martin.  See Motion at 3.  The United States alleges that Martin admitted to the rape, showed officers where it occurred, and showed them where he had thrown her dirty shirt of which he disposed to hide evidence of the rape.  See Motion at 3.  The United States reports that, following an examination of the DNA from E.P's semen sample, the sample was matched to Martin.  See Motion at 3.

During an evaluation, Martin stated in his own account of the incident some of these basic

facts.  See Forensic Evaluation Received as to Nathan Edwin Martin, filed November, 20, 2009 ("Forensic Evaluation")(Doc. 36).  Martin's attorney, Federal Public Defender Stephen McCue, states that Martin has been in tribal or federal custody since December 3, 2007.  See Defendant's Response to United States' Motion for Additional Evaluations ¶ 8, at 4, filed August 10, 2011 (Doc. 58)("Response").  Mr. McCue contends that, because of Martin's mental retardation, Martin cannot function in the general population in a normal jail setting and thus has spent much of the past three and a half years in solitary confinement.  See Response ¶ 8, at 4.  His attorney reports that he has attempted to commit suicide at least once while incarcerated.  See Response ¶ 8, at 4.

## PROCEDURAL BACKGROUND

On May 6, 2009, the United States requested that Martin undergo psychiatric/psychological examination pursuant to 18 U.S.C. §§ 4241 and 4242.  Subsequently, Butner, North Carolina Bureau of Prisons psychiatrist, Ralph Newman, M.D., and psychologist, Maureen Reardon, Ph.D., completed their evaluations, and found Martin incompetent to stand trial and subject to the provisions of 18 U.S.C. § 4246.  See Forensic Evaluation Received as to Nathan Edwin Martin at 1, filed November 20, 2009 (Doc. 36).    On December 17, 2009, based on Dr. Newman and Dr. Reardon's findings, the Court ordered Martin returned to Butner for a risk assessment under 18 U.S.C. § 4246.  See Stipulated Order of Mental Incompetence, filed December 17, 2009 (Doc. 40). The United States did not request that the Court order a sexual dangerousness evaluation pursuant to 18 U.S.C. § 4248.  Accordingly, the Order that the Court entered did not mention an evaluation under 18 U.S.C. § 4248.

On September 17, 2010, Dr. Newman and Dr. Reardon disclosed their findings following their completion of their examination of Martin regarding his dangerousness pursuant to 18 U.S.C. § 4246.  See Sealed Forensic Examination Received as to Nathan Edwin Martin, filed September

17, 2010 ("Sealed Forensic Examination")(Doc. 45). The report also contained the findings of a risk assessment panel composed of several more qualified examiners. See Sealed Forensic Examination at 2. Martin entered the facility in Butner on July 20, 2010. See Sealed Forensic Examination at 3. The report was made on September 3, 2010 and signed on September 19, 2010. See Sealed Forensic Examination at 3. Besides Dr. Newman and Dr. Reardon, other mental health and correctional staff observed Martin's behavior during the period of examination. See Sealed Forensic Examination at 4. The report stated that Martin was cooperative during the examination, but that his higher functioning Native American peers can influence him easily. See Sealed Forensic Examination at 4. The report referred back to a previous Forensic Evaluation dated November 11, 2009 for further background information on Martin's history. See Sealed Forensic Examination at 4. The 2010 report indicated that Martin had a self-inflicted stab wound as a teenager. See Sealed Forensic Examination at 4. The doctors described Martin in the report as a soft-spoken, adequately related, Native American male, notably more at ease than his previous admission. See Sealed Forensic Examination at 4-5. He was alert and oriented to person, place, and situation, but not to time. See Sealed Forensic Examination at 5. His speech was poorly articulated, in part because of his missing teeth. See Sealed Forensic Examination at 5. Martin denied delusions, but occasionally heard his name being called. See Sealed Forensic Examination at 5. He said that he no longer feared for his safety, expressing comfort at the idea of returning to the facility. See Sealed Forensic Examination at 5.

The examiners noticed no suicidal or homicidal inclinations. See Sealed Forensic Examination at 5. They indicated that his fund of knowledge was below average, as indicated by his inability to recall any current events, lack of knowledge of geography, and inability to handle money. See Sealed Forensic Examination at 5. During his stay, Martin's personal hygiene and

room sanitation were adequate, the former being better than the latter.  See Sealed Forensic Examination at 5.  No disciplinary actions or incident reports were recorded.  See Sealed Forensic Examination at 5.  He was cooperative and respectful to the staff.  See Sealed Forensic Examination at 5.  He socialized with a select group of Native American inmates.  See Sealed Forensic Examination at 5.  His activities included spending time watching television, relaxing on the recreation yard, attending Sweat Lodge ceremonies, and napping.  See Sealed Forensic Examination at 5.

According to the report, Martin demonstrated no evidence of a mental illness and did not require treatment.  See Sealed Forensic Examination at 5.  His limited ability to read and write, poor fund of knowledge, and lack of a concrete thinking pattern indicate that he suffers from some form of mental defect.  See Sealed Forensic Examination at 5.  The examiners described his interpersonal relationships as at best shallow and empty.  See Sealed Forensic Examination at 5.  During his stay, a belligerent and defiant inmate befriended Martin, during which time Martin took on some of the same hostile mannerisms.  See Sealed Forensic Examination at 5.  Martin's irritability resolved after this relationship ended.  See Sealed Forensic Examination at 5.

The report made a principal diagnosis that Martin was mildly mentally retarded, based on his subaverage intellectual functioning, which the determinations that his Intelligence Quotient ("IQ") is in the low sixties support.  See Sealed Forensic Examination at 6.  The report stated that the likely source of his retardation came from his mother's prenatal alcohol abuse, dangerous early environmental conditions -- such as lack of plumbing, no fresh water, potential neglect -- in infancy and toddler years, poor preventative medical care throughout childhood, and his alcohol abuse from early adolescence into adulthood.  See Sealed Forensic Examination at 6.  The examiners indicated that their prognosis for his improvement is poor.  See Sealed Forensic Examination at 6.  This

conclusion relied on the fact that, despite years of intensive education in a developmental delay program, Martin's cognitive and adaptive skills have continued to test in the range of mild mental retardation.   See Sealed Forensic Examination at 6.   The report further diagnosed that Martin has an alcohol abuse problem based on Martin's history of drinking up to a six-pack of beer a day and several alcohol-related misdemeanors with which he has been charged.   See Sealed Forensic Examination at 6.   Martin denied drinking alcohol immediately before the alleged offense.   See Sealed Forensic Examination at 6.

In response to the Court's question whether, pursuant to 18 U.S.C. § 4246, Martin's mental defect would create a substantial risk of bodily injury to another person or serious damage to the property of another, the examiners convened a risk assessment panel on August, 30, 2010.   See Sealed Forensic Examination at 6.   The report commented that whether a person will behave aggressively or destructively is a function of a variety of factors, including history, personal disposition, and situational variables which cannot all be known in advance.   See Sealed Forensic Examination at 6.   The report further commented that considering the available historical data and the anticipated situational factors makes it possible to estimate relative risk.   See Sealed Forensic Examination at 6.   The examiners stated that, to make this determination, they applied a twenty-item checklist called the HCR-20 to impose a structure on the violence risk assessment, thereby increasing its reliability and validity.   See Sealed Forensic Examination at 7.   Violence, as defined by the HCR-20, involves actual, attempted, or threatened harm to a person or persons.   See Sealed Forensic Examination at 7.   The HCR-20 checklist includes ten historical items, including previous violence, prior psychopathology, and social/occupational functioning.   See Sealed Forensic Examination at 7.   The checklist also includes five clinical items that reflect current dynamic correlates, including insight, active psychopathology, and impulsivity.   See Sealed Forensic

Examination at 7.  Lastly, the checklist includes five risk-management items that look at situational, post-assessment factors that could aggravate or mitigate a violence risk.

As part of this process, the examiners rate each item by level of certainty as: (i) absent; (ii) possibly present; or (iii) definitely present.  See Sealed Forensic Examination at 7.  These determinations translate into scores of zero, one, or two for each item, with two representing definitely present.  See Sealed Forensic Examination at 7.  This test does not provide a numeric estimate of risk based on adding all the numbers together.  See Sealed Forensic Examination at 7.  Instead, a final judgment regarding risk for future violence, either low, moderate, or high, is based on an analysis of the twenty risk factor items.  See Sealed Forensic Examination at 7.

In the first category of items, the historical items, Martin obtained a four out of a possible twenty.  See Sealed Forensic Examination at 7.  He was given a two for substance abuse and a score of one for both early maladjustment and the presence of a mental illness.  See Sealed Forensic Examination at 7.  Zero points were assigned for his inability to maintain employment resulting from his mental illness, previous violence, prior supervision failure, and personality disorder.  See Sealed Forensic Examination at 7.  In the second category of items, the clinical items, Martin obtained a six out of ten.  See Sealed Forensic Examination at 7.  He was given a two for both impulsivity and lack of insight.  See Sealed Forensic Examination at 7.  He was given a one for active symptoms of a mental illness and unresponsiveness to treatment.  See Sealed Forensic Examination at 7.  He was given a zero for negative attitudes.  See Sealed Forensic Examination at 7.  In the third category of items, the risk-management items present if he would be released to the community in the near future, Martin obtained a five out of ten.  See Sealed Forensic Examination at 7.  He received a two for the feasibility of his plans based on the consideration of his limited resources, his lack of insight, and his likelihood of homelessness.  See Sealed Forensic Examination

-7-

at 7.  He was given a two for lack of personal support and a one for stress.  <u>See</u> Sealed Forensic Examination at 7.  He was given a zero for likely non-compliance with remediation attempts.  <u>See</u> Sealed Forensic Examination at 7.

Based on this scoring method, the examiners assigned Martin a final risk judgment of fifteen out of forty and considered him to be a low to moderate risk.  <u>See</u> Sealed Forensic Examination at 8.  Following this assessment, the report details several factors at which the clinical team and risk panel members looked in closer detail as part of their analysis.  <u>See</u> Sealed Forensic Examination at 8.  First, these factors include Martin's past history of violence, specifically that he lacks a history of violent behavior other than the currently alleged offense of sexual assault.  <u>See</u> Sealed Forensic Examination at 8.  More specifically, the rest of his legal history involves non-violent offenses other than one incident of assault-related-to-a-resisting-arrest charge.  <u>See</u> Sealed Forensic Examination at 8.  That fact weighed against a finding of a risk of future dangerous.  <u>See</u> Sealed Forensic Examination at 8.  Second, with respect to any mental illness or defects, the report states that some forms of mental illnesses can increase the risk for violence, but that Martin's condition of mild mental retardation does not carry this risk.  <u>See</u> Sealed Forensic Examination at 8.  Third, with respect to substance abuse, the report indicates that substance abuse is a well-known risk factor for dangerous behavior and that this particular factor is Martin's primary risk factor.  <u>See</u> Sealed Forensic Examination at 8.  Fourth, with respect to weapons, the report states that Martin as part of his job as a sheep herder has been issued a .22 caliber rifle to scare coyotes.  <u>See</u> Sealed Forensic Examination at 8.  Outside of his employment, there was no indication he has used or owned a gun or knife, or that he has any interest in weapons.  <u>See</u> Sealed Forensic Examination at 8.  The report also states that the alleged offense did not involve a weapon.  <u>See</u> Sealed Forensic Examination at 8.  Fifth, with respect to social support, the report states that social support plays a role in decreasing

-8-

the risk of future violence.  See Sealed Forensic Examination at 8.  The report then states that Martin has no social support, based on his lack of family or lack of contact with them as well as his nomadic lifestyle.  See Sealed Forensic Examination at 8.  Sixth, with respect to institutional adjustment, the report asserts that Martin has had an adequate adjustment to the institution, and has had no disciplinary actions or incident reports involved with his stay there.  See Sealed Forensic Examination at 8.  Thus, this factor supports a finding of a lower risk of future dangerousness.  See Sealed Forensic Examination at 8.

On November 18, 2010, the United States filed its Motion to Return Defendant for Evaluation to Determine Sexual Dangerousness.  See (Doc. 50).  The Court held a hearing on this motion on November 30, 2010.  At the November 30, 2011 hearing, the United States argued that an additional examination regarding Martin's sexual dangerousness, pursuant to 18 U.S.C. § 4248, was necessary.  See Transcript of Hearing at 4:15-22 (taken November 30, 2010)("Nov. 30, 2010 Tr.")(Doc. 56)(Brawley).  The United States argued that the HCR-20 dangerousness evaluation does not cover any kind of sexual triggers in a person or a person's propensity to be sexually dangerous. See Nov. 30, 2010 Tr. at 6:22-7:3 (Brawley).  The Court also inquired whether it had authority to order a second examination after the first 18 U.S.C. § 4246 evaluation.  See Nov. 30, 2010 Tr. at 8:10-24 (Court).  Mr. McCue characterized 18 U.S.C. § 4248 commitment as only for fixated pedophiles or confirmed sexual predators.  See Nov. 30, 2010 Tr. at 14:8-10 (McCue).  The Court then spoke with Dr. Jean Zula on the telephone at the Butner facility after it was unable to contact Dr. Newman and Dr. Reardon.  Dr. Reardon was on maternity leave at the time.  See Nov. 30, 2010 Tr. at 19:8-9 (Zula).  Dr. Zula was not sure if Dr. Newman was available that day, so the Court asked her if she would have Dr. Newman call the courtroom while the hearing was still taking place.  See Tr. at 19:9-18, 29:25-30:6 (Zula, Court).   When asked to clarify how different a § 4246

dangerousness evaluation and a § 4248 sexual dangerousness evaluation are, Dr. Zula responded: "I don't know about very different but they're not exactly the same. But we do look at sexually dangerous behavior under 4246 . . . ." Nov. 30, 2010 Tr. at 22:10-22:18 (Court, Zula). Dr. Zula stated that she did not see any reference to a 18 U.S.C. § 4248 in Dr. Newman and Dr. Reardon's report. See Nov. 30, 2010 at 23:17-21 (Brawley, Zula). When asked whether during a § 4246 evaluation, the examiners at Butner ever refer a patient for a § 4248 evaluation, Dr. Zula stated that the examiners refer them for a § 4248 evaluation only if there are some kind of indicators of sexual dangerousness, such as inappropriate sexual conduct, particularly involving children. See Nov. 30, 2010 at 24:14-25:15 (Brawley, Zula). Dr. Zula stated that, in Martin's case, the examiners saw no such indicators given his lack of history of this conduct. See Nov. 30, 2010 Tr. at 27:18-21 (Zula).

The Court took the United States' first motion under advisement. Because the Court did not hear from Dr. Newman during the November 30, 2010 hearing, the Court said that, when Dr. Newman called the Court, it would tell him to call both of the attorneys in the case. See Tr. at 31:25-32:2 (Court). The Court told the attorneys that, if they gained any additional information from Dr. Newman, that they should put it in a letter and send it to the Court, with a copy to opposing counsel. See Tr. at 32:2-4 (Court). In a letter to the Court, Mr. McCue discussed a subsequent conversation with Dr. Newman. See Letter from Stephen P. McCue to the Court at 1, filed December 1, 2010 (Doc. 52)("Letter"). According to Mr McCue, Dr. Newman stated that Martin was "so far from meeting the criteria for § 4248 commitment that it was ridiculous." Letter at 1. Mr McCue also reported that Dr. Newman stated it would not be necessary to return Martin to Butner for a § 4248 evaluation. See Letter at 1. As stated in Mr McCue's letter, Dr. Newman went on to say that, if Martin ever returned to BOP custody, he would be screened by his case manager for § 4248 commitment and that the screener could review the psychological reports prepared to date

by the BOP.  See Letter at 1.  According to Mr. McCue, Dr. Newman was confident that Martin would "screen out" for § 4248 commitment, in other words, that Martin would not be eligible. Letter at 1.  Dr. Newman stated that § 4248 commitments generally apply to individuals with a sexual diagnosis, such as pedophilia.  See Letter at 1.  Dr. Newman then said that Martin was so low functioning that he did not have that disorder.  See Letter at 1.  At the August 31, 2011 hearing, the United States informed the Court that it had spoken with Dr. Newman back in June and  that he indicated that there was no § 4248 assessment done automatically with respect to Martin, probably because of Dr. Newman's feelings that Martin was not close to meeting the § 4248 criteria.  See Transcript of Hearing at 4:3-9 (taken August 31, 2011)("Aug. 31, 2011 Tr.")(Long).[1]

On July 12, 2011, the United States filed its second Motion without submitting a letter to the Court about its conversations with Dr. Newman.  In its Motion, the United States reported that it was its understanding at the time of filing the Motion that Dr. Newman did not call back with any further information since the November 29, 2010 hearing.  See Motion at 8.  The United States requests in its Motion that the Court return Martin for a risk assessment pursuant to 18 U.S.C. § 4246 and alternatively under § 4248.  See Motion at 1.  Specifically, the United States' main complaints about the first report under § 4246 involve: (i) how Martin was assigned a score of zero for whether he would likely not be compliant with remediation attempts in spite of his alcohol abuse issues; (ii) that the report never explains how Martin's rape of E.P. while sober may be squared with the evaluators' emphasis on substance abuse as a risk factor; (iii) how the examiners state that no weapon was used in the underlying offense when Martin allegedly kicked E.P. with his work boots and used a stick to beat her; (iv) that the report indicates that the review the panel concluded that Martin does not

---

[1]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

meet the criteria for commitment pursuant to § 4246 even though the Court has not yet held a hearing on this matter; (v) that the report gives only a brief discussion of Martin's rape of E.P.; and (vi) that the report does not pay any attention to Martin's lack of remorse.  <u>See</u> Motion 7-8, 10-11. With respect to an evaluation under § 4248, the United States points out that Dr. Newman never performed such a report on sexual dangerousness and that, unlike the current report, a sexual dangerousness assessment would also include a psychosexual evaluation unlike the current report. <u>See</u> Motion at 14.

In response, Mr. McCue argues that the United States wants a second bite at the apple with regard to an examination and that the United States has overemphasized any deficiencies in the report.  <u>See</u> Response ¶¶ 1-6, at 1-3.  Additionally, Mr. McCue argues that 18 U.S.C. § 4246(b) does not authorize a second examination.  <u>See</u> Response ¶ 4, at 3.  Mr. McCue points out the length of Martin's detention and the rough conditions Martin has faced while in custody, including an attempted suicide.  <u>See</u> Response ¶ 8, at 4.  Mr. McCue states that Martin has family who are willing to take him to live in their homes, to assist in his supervision, and to assist in having his social-security disability reinstated.  <u>See</u> Response ¶ 9, at 4.  Mr. McCue then argues that the proper step now is to release Martin from custody.  <u>See</u> Response ¶ 11, at 5.

At the August 31, 2011 hearing, the main issues not discussed in detail in the parties' briefs or at the prior hearing included Mr. McCue's representation that the Court could order a conditional release of a defendant under 18 U.S.C. §§ 4246 or 4248 without a correctional facility official taking any action.  <u>See</u> Aug. 31, 2011 Tr. at 13:7-14:6, 17:21-19:7 (Court, McCue).  The Court also raised concerns to what extent it could order Bureau of Prisons officials to do something regarding further evaluations.  <u>See</u> Aug. 31, 2011 Tr. at 10:2-10:12 (Court).  This issue came up at the hearing, because the United States suggested that a subsequent evaluation of Martin take place at a different

facility than Butner, such as the Springfield, Missouri facility, that does these types of evaluations. Aug. 31, 2011 Tr. at 6:22-7:2 (Long). The Court also questioned the attorneys whether someone could not qualify for commitment under 18 U.S.C. § 4246 but still qualify for commitment under 18 U.S.C. § 4248. See Aug. 31, 2011 Tr. at 25:5-26:25 (Court, Long). There was also a discussion of how many examiners were on the panel that reviewed the report from Dr. Newman and Dr. Reardon on Martin's dangerousness under 18 U.S.C. § 4246. The United States clarified that there were four total examiners on the panel: Dr. Newman, Dr. Reardon, a chief psychiatrist, and a chief psychologist. Aug. 31, 2011 Tr. at 6:12-17 (Court, Long).

## LAW REGARDING 18 U.S.C. § 4246

Congress amended 18 U.S.C. § 4246 into its modern form in 1984 as part of the Insanity Defense Reform Act of 1984. See Insanity Defense Reform Act of 1984, Pub. L. No. 98-473, § 402, 98 Stat. 1837. This statute allows a district court to order the civil commitment of an individual who has been committed to the custody of the Attorney General based on a determination of mental incompetency if the government proves that individual is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(a). To detain such a person, the United States, acting through the Department of Justice, must certify to a federal district judge that the prisoner meets the conditions just described. See 18 U.S.C. § 4246(a). When such a certification is filed, the statute automatically stays the individual's release from prison, thereby giving the United States an opportunity to prove its claims of dangerousness under § 4246 at a hearing through psychiatric or other evidence. See 18 U.S.C. §§ 4246(a)-(b), 4247(b)-(c).

Before the hearing occurs, "the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed

with the court, pursuant to" 18 U.S.C. § 4247(b) and (c).  18 U.S.C. § 4246(b).  The statute, 18

U.S.C. § 4246, provides that the prisoner "shall be represented by counsel," and shall have "an

opportunity" at the hearing "to testify, to present evidence, to subpoena witnesses on his behalf, and

to confront and cross-examine" the United States' witnesses.  18 U.S.C. §§ 4246(c), 4247(d).

      If at the hearing the United States proves its claim of dangerousness under § 4246 by "clear

and convincing evidence," the court will order the prisoner's continued commitment in "the custody

of the Attorney General," who must "make all reasonable efforts to cause" the State where that

person was tried, or the State where he is domiciled, to "assume responsibility for his custody, care,

and treatment."  18 U.S.C. § 4246(d).  If either State is willing to assume that responsibility, the

Attorney General "shall release" the individual "to the appropriate official" of that State. 18 U.S.C.

§ 4246(d).  If, however, "notwithstanding such efforts, neither such State will assume such

responsibility," then "the Attorney General shall place the person for treatment in a suitable

facility."  18 U.S.C. § 4246(d).  Confinement in the federal facility will last until either: (i) the

director of the facility in which the person is hospitalized determines and then files a certificate with

the court that the person's mental condition has improved to the point where he or she is no longer

dangerous, with or without appropriate ongoing treatment; or (ii) a State assumes responsibility for

his or her custody, care, and treatment, in which case he or she will be transferred to the custody of

that State.  See 18 U.S.C. § 4246(d)(1)-(2), (e).  When the first situation applies, the court can either

order the release of the defendant or, on its own motion or the United States' motion, hold a hearing

to determine whether by a preponderance of the evidence release should occur and whether to

impose any conditions on release.  See 18 U.S.C. § 4246(e).  Lastly, the statute establishes a system

for ongoing psychiatric and judicial review of the individual's case, including judicial hearings at

the confined person's request at six-month intervals.  See 18 U.S.C. § 4247(e)(1)(B), (h).

## LAW REGARDING 18 U.S.C. § 4248

Congress amended 18 U.S.C. § 4248 in July 2006 as part of the Adam Walsh Child Protection and Safety Act of 2006 to allow the civil commitment of sexually dangerous persons. See Adam Walsh Child Protection Safety Act of 2006, Pub. L. No. 109-248, § 302m, 120 Stat. 587, 619-622.  The basic structure of the statute is highly similar to 18 U.S.C. § 4246.  See United States v. Comstock,  130 S. Ct. 1949, 1961 (2010).  18 U.S.C. § 4248, allows a district court to order the civil commitment of an individual who has been committed to the custody of the Attorney General based on a determination of mental incompetency if the government proves that individual: (i) is sexually dangerous in that he has previously "engaged or attempted to engage in sexually violent conduct or child molestation"; (ii) currently "suffers from a serious mental illness, abnormality, or disorder"; and (iii) "as a result of" that mental illness abnormality or disorder is "sexually dangerous to others" in that "he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. §§ 4247(a)(5)-(6), 4248(a).  Accord  United States v. Comstock, 130 S. Ct. at 1954.

To detain such a person, the United States, acting through the Department of Justice, must certify to a United States district judge that the prisoner meets the statutory conditions, i.e., that he has engaged in sexually violent activity or child molestation in the past, and that he suffers from a mental illness that makes him correspondingly dangerous to others.  See 18 U.S.C. § 4248(a); United States v. Comstock, 130 S. Ct. at 1954.  When such a certification is filed, the statute automatically stays the individual's release from prison, thereby giving the United States an opportunity to prove its claims of sexual dangerousness under § 4248 at a hearing through psychiatric or other evidence.  See 18 U.S.C. §§ 4247(b)-(c), 4248(a)-(b); United States v. Comstock, 130 S. Ct. at 1954.  Before the hearing occurs, "the court may order that a psychiatric

or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to" 18 U.S.C. § 4247(b) and (c).  18 U.S.C. § 4248(b).  The statute, 18 U.S.C. § 4248, provides that the prisoner "shall be represented by counsel," and shall have "an opportunity" at the hearing "to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine" the United States' witnesses.  18 U.S.C. §§ 4247(d), 4248(c).  Accord United States v. Comstock, 130 S. Ct. at 1954.

If, at the hearing, the United States proves its claims of sexual dangerousness under § 4248 by "clear and convincing evidence," the court will order the prisoner's continued commitment in "the custody of the Attorney General," who must "make all reasonable efforts to cause" the State where that person was tried, or the State where the person is domiciled, to "assume responsibility for his custody, care, and treatment." 18 U.S.C. § 4248(d).  Accord United States v. Comstock, 130 S. Ct. at 1954.  If either State is willing to assume that responsibility, the Attorney General "shall release" the individual "to the appropriate official" of that State. 18 U.S.C. § 4248(d).  Accord United States v. Comstock, 130 S. Ct. at 1954-55.  If, however, "notwithstanding such efforts, neither such State will assume such responsibility," then "the Attorney General shall place the person for treatment in a suitable facility." 18 U.S.C. § 4248(d).  Accord United States v. Comstock, 130 S. Ct. at 1955.  Confinement in the federal facility will last until either: (i)  the director of the facility in which the person is hospitalized determines and then files a certificate with the court that the person's mental condition has improved to the point where he or she is no longer sexually dangerous, with or without appropriate ongoing treatment; or (ii) a State assumes responsibility for his or her custody, care, and treatment, in which case he or she will be transferred to the custody of that State.  See 18 U.S.C. § 4248(d)(1)-(2), (e); United States v. Comstock, 130 S. Ct. at 1955.  When the first situation applies, the court can either order the release of the defendant or, on its own

-16-

motion or the United States' motion, hold a hearing to determine whether by a preponderance of the evidence release should occur and whether to impose any conditions on release.  See 18 U.S.C. § 4248(e).  The statute establishes a system for ongoing psychiatric and judicial review of the individual's case, including judicial hearings at the confined person's request at six-month intervals.  See 18 U.S.C. § 4247(e)(1)(B), (h); United States v. Comstock, 130 S. Ct. at 1955.

These provisions withstood a recent challenge to their constitutionality arguing that they exceeded Congress' Necessary And Proper Clause powers.  See United States v. Comstock, 130 S. Ct. at 1958-65.

## STRUCTURE OF A PSYCHIATRIC OR PSYCHOLOGICAL EXAMINATION UNDER 18 U.S.C. § 4247

Both 18 U.S.C. §§ 4246 and 4248 authorize the court to order before the date of the civil commitment hearing that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to 18 U.S.C. § 4247(b) and (c).  See 18 U.S.C. §§ 4246(b), 4248(b).  18 U.S.C. § 4247(b) requires that the time period for commitment of a person for an examination under 18 U.S.C. §§ 4246 or 4248 last only for a reasonable period of time, not to exceed forty-five days.[2]  See 18 U.S.C. § 4247(b).[3]  The

---

[2]In comparison, the commitment for the an examination to determine competency to stand trial under 18 U.S.C. § 4241 must last only "for a reasonable period, but not to exceed thirty days." 18 U.S.C. § 4247(b).  After the court has, by a preponderance of the evidence, found "that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent," then the Bureau of Prisons must hospitalize the defendant "for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward."  18 U.S.C. § 4241(d).

[3]"The director of the facility may apply for a reasonable extension, but not to exceed . . . thirty days under section 4242, 4243, 4246, or 4248 upon a showing of good cause that the additional time is necessary to observe and evaluate the defendant."  18 U.S.C. § 4247(b).

language in each of these sections, 18 U.S.C. §§ 4246(b) and 4248(b), to the effect that "the court may order" the examination to take place indicates that the decision is discretionary. See 18 U.S.C. §§ 4246(b), 4248(b); Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 346 (2005)("The word 'may' customarily connotes discretion."); United States v. Martinez-Haro, 645 F.3d 1228, 1233 (10th Cir. 2011)("The statute does not state that the court may order only one psychiatric or psychological examination. And the statute does not state that the court may order just a single psychiatric or psychological examination.").

With respect to a district court authorizing multiple examinations of a defendant under the procedures set out in 18 U.S.C. § 4247(b) in the context of a competency examination, the United States Court of Appeals for the Tenth Circuit has stated: "Nothing in this language limits the second examiner to the initial examination of the defendant nor does the language restrict the ability of the court to order a second examination after the initial examination." United States v. Martinez-Haro, 645 F.3d at 1233. The decision to order a second examination under this statute is reviewed for abuse of discretion. See United States v. Martinez-Haro, 645 F.3d at 1233. One district court in Maine has held that a district court can order multiple examinations under 18 U.S.C. § 4246. See United States v. Hardy, 770 F. Supp. 2d 410, 411 (D. Me. 2011)("The court of that district then holds a hearing on the matter and can order additional psychiatric or psychological examinations and reports as necessary before determining whether civil commitment is appropriate."). Examinations occur pursuant to 18 U.S.C. § 4247(b), which authorizes temporary commitment of the person for an examination. See 18 U.S.C. § 4247(b) ("[T]he court may commit the person to be examined . . . under section 4242, 4243, 4246, 4248 . . . ."). "Commitment [for an examination] is not mandatory, and the court may order that the exam be conducted on an outpatient basis." Charles Alan Wright & Andrew D. Leipold, Federal Practice and Procedure § 208, at 519 (4th ed.

2008).  Notably, the Tenth Circuit expressed concern that a situation might exist where "a defendant was found incompetent and the district court then allowed the Government to conduct more competency examinations only for the purpose of 'shopping' for a psychologist or psychiatrist who would conclude that the defendant was competent."  United States v. Martinez-Haro, 645 F.3d at 1233.  The same potential for concern would likely exist in the civil commitment context where a district court ordered another examination after examiners had concluded in a prior examination that the defendant was not presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another.  See 18 U.S.C. § 4246(a).  Cf. United States v. Martinez-Haro, 645 F.3d at 1233.

A limited number of cases address the interplay between 18 U.S.C. §§ 4246 and 4248 with respect to what extent the determinations that a person is presently suffering from a mental disease or defect as a result of which his or her release would create a substantial risk of bodily injury to another person or serious damage to property of another, as opposed to him or her being a sexually dangerous individual.  See 18 U.S.C. §§ 4246(a), 4248(a).  The Supreme Court mentioned in passing that "many of these [sexually dangerous] individuals were likely already subject to civil commitment under § 4246" when upholding 18 U.S.C. § 4248 as a proper exercise of Congress' powers under the Necessary and Proper Clause.  United States v. Comstock, 130 S. Ct. at 1961. One district court in Pennsylvania described the two statutes as offering the United States a different "option" to seek civil commitment of a person.  United States v. Grape, No. 05-33, 2010 WL 2165360, at *7-9 (W.D. Pa. May 27, 2010).  Another district court in Oklahoma ordered that medical professionals make a separate determination on each of these issues following a determination that the defendant was incompetent.  See United States v. Hardy, No. 07-MJ-108,

2008 WL 4682218, at *8 (N.D. Okla. Oct. 22, 2008).

When interpreting a particular statute, a court should look not only to the particular statutory language, but also to the design of the statute as a whole.  See United States v. Atl. Research Corp., 551 U.S. 128, 135 (2007).  A court should, if possible, construe a statute in a way that gives every word in the statute operative effect.  See United States v. Nordic Vill., Inc., 503 U.S. 30, 35-36 (1992).  At two different times, Congress authorized an alternative method of civil commitment, with the most recent being § 4248 under the Adam Walsh Child Protection and Safety Act of 2006 and the earlier one being the modern § 4246 enacted several decades ago.  See Adam Walsh Child Protection Safety Act of 2006, Pub. L. No. 109-248, § 302m, 120 Stat. 587, 619-622; Insanity Defense Reform Act of 1984, Pub. L. No. 98-473, § 402, 98 Stat. 1837.  Likewise, § 4247 denominates two separate inquiries that a medical professional can make in a psychological or psychiatric report: (i) an inquiry under § 4246 whether a person is suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another; and (ii) an inquiry under § 4248 whether person is a sexually dangerous person.  See 18 U.S.C. § 4247(c)(4)(C)-(D).  Thus, the inquiries are separate and the determinations are separate.

Given that the court has discretion to order a psychological or psychiatric report at all under §§ 4246 and 4248, the court can consider a variety of relevant information in the civil commitment context.  See 18 U.S.C. §§ 4246, 4248; Jama v. Immigration & Customs Enforcement, 543 U.S. at 346; United States v. Martinez-Haro, 645 F.3d at 1233.  While the inquiries under §§ 4246 and 4248 are separate in that commitment can occur under either statute separately and the criteria for commitment are different, the discretion these statutes authorize a court to exercise would permit a district court to consider any psychological or psychiatric report to the extent it impacted the

-20-

inquiry under either statute.  See 18 U.S.C. §§ 4246, 4248; Jama v. Immigration & Customs Enforcement, 543 U.S. at 346; United States v. Martinez-Haro, 645 F.3d at 1233.  To clarify, in the context of this case, nothing would forbid the Court from considering a psychological or psychiatric report made pursuant to 18 U.S.C. § 4246 when making an inquiry under 18 U.S.C. § 4248 to the extent the previous report was relevant to the issue.  See 18 U.S.C. §§ 4246, 4248; Jama v. Immigration & Customs Enforcement, 543 U.S. at 346; United States v. Martinez-Haro, 645 F.3d at 1233.

While the inquiry and determination whether a person is suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, as opposed to whether a person is a sexually dangerous person are distinct, the basic factual inquiries a thorough report regarding each would have to make are similar.  See 18 U.S.C. §§ 4246(a), 4247(a)(5)-(6), 4248(a).  If someone does not meet the criteria that they have a mental disease or defect as a result of which his or her release would create a substantial risk of bodily injury to another person or serious damage to property of another, it is not likely that the person would qualify as a sexually dangerous person -- further defined as a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others.  See 18 U.S.C. §§ 4246(a), 4247(a)(5)-(6), 4248(a).  The term "sexually dangerous to others" is further defined as a "person [that] suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C. § 4247(a)(6).  This last provision in 18 U.S.C. § 4247(a)(6) shares some similarities with the basis for commitment in § 4246(a).  See 18 U.S.C. §§ 4246(a), 4247(a)(5)-(6), 4248(a).

## LAW REGARDING COURT'S AUTHORITY OVER A DEFENDANT TO RETAIN OR RELEASE THE DEFENDANT UNDER 18 U.S.C. §§ 4246, 4248

The provisions in 18 U.S.C. §§ 4246 and 4248 regarding retaining or releasing a defendant are similar.  If, under both statutes, the court finds by clear-and-convincing evidence that the person meets the criteria for commitment, and no state official is willing to take custody of the individual in question, the Attorney General must hospitalize the person for treatment in a suitable facility.  See 18 U.S.C. §§ 4246(d), 4248(d).  This hospitalization continues until the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not: (i) under 18 U.S.C. § 4246 create a substantial risk of bodily injury to another person or serious damage to property of another; or (ii) under 18 U.S.C. § 4248 be sexually dangerous to others.  See 18 U.S.C. §§ 4246(d), 4248(d).  The Director of the facility in which a person is placed initially makes this determination that the person no longer meets the definition for commitment under each respective statute, which the Director memorializes in a certificate that he or she files with the clerk of court.  See 18 U.S.C. §§ 4246(d), 4248(d).  The district court can then order the discharge of the person or, on the motion of the attorney for the United States or on its own motion, shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine whether he should be released.  See 18 U.S.C. §§ 4246(d), 4248(d). At the hearing, the court can, on a showing by a preponderance of the evidence that the person has recovered from his mental disease or defect, unconditionally or conditionally, release the person. See 18 U.S.C. §§ 4246(d), 4248(d).  Additionally, 18 U.S.C. 4247(h) states:

> Regardless of whether the director of the facility in which a person is committed has filed a certificate pursuant to the provisions of subsection (e) of section 4241 . . . 4246, or 4248 . . . , counsel for the person or his legal guardian may, at any time during such person's commitment, file with the court that ordered the commitment a motion for a hearing to determine whether the person should be discharged from such facility.

18 U.S.C. § 4247(h).  18 U.S.C. § 4247(h) does not refer to imposing any conditions on release.  See

18 U.S.C. § 4247(h).  In an unpublished opinion, the United States Court of Appeals for the Fourth

Circuit mentioned in a footnote that, after moving for a hearing under 18 U.S.C. § 4247(h), if a

defendant successfully persuades a district court that his confinement under 18 U.S.C. § 4246 is no

longer appropriate, the defendant would be unconditionally discharged from confinement as opposed

to conditionally released.  See United States v. Anderson, No. 95-7775, 1996 WL 733141, at *2 n.4

(4th Cir. Dec. 23, 1996)(unpublished).  One district court in Minnesota stated that a district court

can conditionally release a defendant under 4246(e)(2) after the defendant files a motion under 18

U.S.C. § 4247(h).  See United States v. McAllister, 963 F. Supp. 829, 833-34 (D. Minn. 1997).  It

is not necessary to resolve these conflicting cases at this time, because the statutory language in 18

U.S.C. § 4246 more clearly indicates that a district court can conditionally release a defendant under

18 U.S.C. § 4246 only after actual commitment for dangerousness under that statute has occurred.

See 18 U.S.C. § 4246(d)-(e).  Cf. United States v. Stewart, 452 F.2d 266, 270 n.6 (3d Cir.

2006)(stating, in the context of conditionally releasing an insane defendant based on similar

statutory language, that conditional release was only appropriate after hospitalization and

commitment under the earlier subsection in the statute analogous to § 4246(d)).  18 U.S.C. § 4248

mirrors 18 U.S.C. § 4246 on this point.  See 18 U.S.C. § 4248(d)-(e).  In comparison, 18 U.S.C.

§ 4241, the statute that authorizes temporary commitment of a defendant based on mental

incompetency, has no comparable provision authorizing conditional release.  See 18 U.S.C. § 4241.

        These statutes do not authorize a district court to conditionally release a person on its own

initiative before civil commitment under 18 U.S.C. §§ 4246 or 4248 has occurred.  Statutory

interpretation begins with the language of a statute.  See Knight v. Comm'r, 552 U.S. 181, 187

-23-

(2008). If the language of the statute is clear, that is the end of the court's inquiry regarding the meaning of the statute. See Dodd v. United States, 545 U.S. 353, 357 (2005). Here, there is no authorization in these statutes for a district court to conditionally release a defendant on its own initiative. See 18 U.S.C. §§ 4246(d)-(e), 4248(d)-(e). The statutes contemplate the Director of the facility in which a person is placed making this determination initially and then filing an appropriate certificate to this effect with the court. See 18 U.S.C. §§ 4246(d)-(e), 4248(d)-(e). Alternatively, the counsel for the defendant or his legal guardian can move that the district court hold a hearing on release. See 18 U.S.C. § 4247(h). Nothing in these statutes specifies that a court may conditionally release a defendant under any other circumstances, particularly when commitment for dangerousness or sexual dangerousness has not yet occurred. See 18 U.S.C. §§ 4246, 4248. Notably, once the court has determined that a defendant is incompetent as specified in 18 U.S.C. § 4241, the respective time limits for holding a defendant until he becomes or is likely to become competent have passed, and once it is determined that the defendant's mental condition has not so improved to permit proceedings to go forward, the defendant becomes subject to the provisions of 18 U.S.C. §§ 4246 and 4248. See 18 U.S.C. § 4241(d).

## LAW REGARDING COURT'S AUTHORITY TO SPECIFY A LOCATION FOR A MENTAL EXAMINATION UNDER 18 U.S.C. § 4247

As a general matter, the Bureau of Prisons has complete discretion to determine where to confine an inmate. See 18 U.S.C. § 3621 ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment."); United States v. Williams, 65 F.3d 301, 307 (2d Cir. 1995)("A sentencing court has no authority to order that a convicted defendant be confined in a particular facility, much less placed in a particular treatment program; those decisions are within the sole discretion of the Bureau of Prisons."). A district court may not order the particular location where

the Bureau of Prisons will confine an inmate following conviction.  See 18 U.S.C. § 3621; United States v. Williams, 65 F.3d at 307.

The language of 18 U.S.C. § 4247 reflects a grant of this same level of discretion to the Bureau of Prisons.  18 U.S.C. § 4247(b) states:

> For the purposes of an examination pursuant to an order under . . . the court may commit the person to be examined . . . to the custody of the Attorney General for placement in a suitable facility. Unless impracticable, the psychiatric or psychological examination shall be conducted in the suitable facility closest to the court.  The director of the facility may apply for a reasonable extension, but not to exceed fifteen days under section 4241, 4244, or 4245, and not to exceed thirty days under section 4242, 4243, 4246, or 4248 upon a showing of good cause that the additional time is necessary to observe and evaluate the defendant.

18 U.S.C. § 4247(b).  This statute's language states that the person will go into the Department of Justice's custody "for placement in a suitable facility."  No cases have dealt with a district court's authority to order that a mental examination under this section take place at a particular location.  Given, however, the discretion that Congress normally gives to the Bureau of Prisons on where to house a particular inmate, a court should construe the language in this statute consistently with the Bureau of Prisons' typical discretion. Here, 18 U.S.C. § 4247(b) indicates that the inmate goes into "the custody of the Attorney General for placement in a suitable facility."  18 U.S.C. § 4247(b). This language indicates some level of discretion on the part of the Bureau of Prisons to decide where to house the inmate.  See 18 U.S.C. § 4247(b).  In other contexts, the Bureau of Prisons almost uniformly has the authority to exercise that discretion.  See 18 U.S.C. § 3621; United States v. Williams, 65 F.3d at 307.  Thus, the Bureau of Prisons makes the ultimate decision where the examination under 18 U.S.C. § 4247(b) takes place.  See 18 U.S.C. § 4247(b).

## ANALYSIS

The Court will grant in part and deny in part both of the United States' Motions.  The Court

will not authorize a second examination of Martin under 18 U.S.C. § 4246.  The Court will, however, order an examination of Martin for sexual dangerousness under 18 U.S.C. § 4248.

## I.      THE COURT WILL NOT ORDER A SECOND EXAMINATION OF MARTIN UNDER 18 U.S.C. § 4246.

The Court will not authorize an additional psychological or psychiatric report of Martin under 18 U.S.C. § 4246.  The United States is correct that a district court may authorize a second psychological or psychiatric report under 18 U.S.C. § 4246.   See 18 U.S.C. § 4246(b); Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 346 (2005); United States v. Martinez-Haro, 645 F.3d 1228, 1233 (10th Cir. 2011).  As the Tenth Circuit stated in the context of additional competency examinations: "Nothing in this language limits the second examiner to the initial examination of the defendant nor does the language restrict the ability of the court to order a second examination after the initial examination."  United States v. Martinez-Haro, 645 F.3d at 1233.  The Tenth Circuit expressed concern, however, over a potential situation where the government was seeking another examination "only for the purpose of 'shopping' for a psychologist or psychiatrist who would conclude that the defendant was competent."  United States v. Martinez-Haro, 645 F.3d at 1233.

Given the thoroughness of the evaluation Dr. Newman and Dr. Reardon conducted and the Tenth Circuit's concern of the United States shopping around for another evaluation for dangerousness, the Court does not find that another evaluation under 18 U.S.C. § 4246 is necessary. There is no indication that the examiners did a cursory job in their evaluation.  See Sealed Forensic Examination at 3-8.  Indeed, the examiners appear to have done a thorough job.  See Sealed Forensic Examination at 3-8. Furthermore, many of the concerns the United States has raised about the report are addressed squarely in the report.  See Sealed Forensic Examination at 3-8.  With respect to the

United States' contention that Martin was inaccurately assigned a score of zero for whether he would likely be compliant with remediation attempts in spite of his alcohol abuse issues, the report addresses Martin's alcohol abuse problems. The report indicates that substance abuse is a well-known risk factor for dangerous behavior and that this factor is Martin's primary risk factor. See Sealed Forensic Examination at 8. He was also given a score of two in the category of substance abuse based on his alcohol problems. See Sealed Forensic Examination at 7. It is unlikely, based on the attention that the report pays to Martin's substance abuse issues, that the examiners did not account for them in their remediation-attempt analysis to the extent they were applicable. With respect to the United States' contention that the report never explains how Martin's rape of E.P. while sober may be squared with the evaluators' emphasis on substance abuse as a risk factor, the report details that, before this incident, Martin had no significant history of violent behavior. See Sealed Forensic Examination at 8. In the context of substance abuse, the report comments generally that "[s]ubstance abuse is a well-known risk factor for dangerous behavior," does not discuss how this risk factor specifically applies to the alleged rape, and mentions that this factor generally indicates a risk of "dangerousness in the community" in the future. Sealed Forensic Examination at 8. With respect to the United States' argument that the examiners state that no weapon was used in the underlying offense when Martin allegedly kicked E.P. with his work boots and used a stick to beat her, the report focuses more on weapons such as knives or guns, including Martin's history of using weapons and interest in owning these types of weapons. See Sealed Forensic Examination at 8. The inquiry that the examiners appear to have made in the report is distinct from the use of any weapon in any context, but instead focuses on the use of weapons such as knives or guns. See Sealed Forensic Examination at 8. Furthermore, the report notes that Martin's charge was for aggravated sexual abuse, so it is less likely that the examiners completely discounted the alleged

facts of the rape.  See Sealed Forensic Examination at 3.

With respect to the United States' contention that the report indicates that Martin meets the § 4246 commitment criteria even though the Court has not yet made such a determination, the Court will disregard any such conclusion to the extent it interferes with its own determination whether Martin should be committed.  The United States also argues that the report only gives a brief discussion of Martin's rape of E.P.  The report recounts the charges and the procedural history of the case.  See Sealed Forensic Examination at 3.  Additionally, the report discusses how the examiners assessed Martin's history of violence without regard to the specifics of this alleged event. See Sealed Forensic Examination at 8.  Thus, the Court does not find that this limited discussion of Martin's rape of E.P. impacts the weight of the report in any substantial way given the nature of the inquiry the examiners stated that they made.  Lastly, with respect to the United States' argument that Martin lacks remorse for his conduct, this factor does not seem to be one of the standard inquiries that these examiners make under an HCR-20 evaluation.  See Sealed Forensic Examination at 6-8. Based on the contents of the report itself, it does not appear that the examiners paid inadequate attention to Martin's mental characteristics.  Based on the examiners' observations while Martin was at their facility, the report discusses in detail Martin's mental faculties, his behavior with others, and any specific mental illnesses he has.  See Sealed Forensic Examination at 4-8.

Not just Dr. Newman and Dr. Reardon found that Martin is not a danger, however, but a panel reviewed their report.  See Sealed Forensic Examination at 3-8.  There were four examiners on the panel: Dr. Newman, Dr. Reardon, a chief psychiatrist, and a chief psychologist.  See Aug. 31, 2011 Tr. at 6:12-17 (Court, Long).  Thus, four examiners have apparently agreed that Martin is not a danger.  And it is important to emphasize that these are government Bureau of Prisons doctors, and not doctors paid a salary by Martin or his attorney, or paid for by the Public Defender's Office.

The Court is not certain what it will do with another report.  If the report confirms what the Butner doctors said, Martin bears the burden of that delay.  If, on the other hand, there is a disagreement in the reports, the Court is put in the difficult position of trying to resolve a debate among a number of government doctors.  While the Court resolves different arguments all the time, the Court may lack particular skills to resolve a dispute among doctors on psychiatric issues.  The Court is concerned it might have to order a third report to help it resolve the debate.  At some point, the debate must come to an end, and the United States does not get to keep seeking a report from government doctors until it gets one it likes.  Other countries have effectively imprisoned persons with mental disabilities under the guise of protecting the public, but the American tradition has not been to commit people to prison or mental institutes merely because they have psychological problems or are even a danger.  Cf. Addington v. Texas, 441 U.S. 418, 425-27 (1979)("Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior.").  Section 4246 is a carefully crafted exception to that tradition, and the Court should be equally careful to carry out its duties by not delaying release with more unnecessary inquiries.  As to another § 4246 examination, the Court believes it is time to bring that inquiry to an end.

## II.    THE COURT WILL ORDER AN EXAMINATION OF MARTIN UNDER 18 U.S.C. § 4248.

Given the results of the § 4246 examination, the Court would be on sound ground to deny the United States an examination under § 4248.  If a person is not dangerous, it is difficult to see how the person could be sexually dangerous.  The word dangerous seems to be broader and more inclusive than sexually dangerous, and one would not expect that someone who is not dangerous would nonetheless be sexually dangerous.

Nevertheless, the two examinations are different and the definitions are different. Congress has passed two statutes giving the court ability to conduct separate investigations and evaluations. Congress has expressed its concern that sexually dangerous people be left free in society. Congress' duplication in the statutory scheme counsels for caution, and perhaps some caution by the Court.

Accordingly, the Court will authorize an examination under 18 U.S.C. § 4248. The United States is correct that a determination of dangerousness under 18 U.S.C. §§ 4246 and 4248 are separate inquiries. When looking at the statute as a whole and construing the statute to give every word in the statute operative effect, the inquiries under §§ 4246 and 4248 are distinct and are independent bases for civil commitment. See 18 U.S.C. §§ 4246-48; United States v. Atl. Research Corp., 551 U.S. at 135; United States v. Nordic Vill., Inc., 503 U.S. at 35-36. See also Adam Walsh Child Protection Safety Act of 2006, Pub. L. No. 109-248, § 302m, 120 Stat. 587, 619-622; Insanity Defense Reform Act of 1984, Pub. L. No. 98-473, § 402, 98 Stat. 1837.

The Court then starts with the basic premise that the inquiry and determination whether a person is suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another under § 4246, and whether a person is a sexually dangerous person under § 4248, are distinct. It is true that the basic factual inquiries a report regarding each would have to make are similar. See 18 U.S.C. §§ 4246(a), 4247(a)(5)-(6), 4248(a). This similarity is particularly true in this case where a report was made under § 4246 first, which is a broader inquiry regarding the person's dangerousness, as opposed to under § 4248, a narrower inquiry on sexual dangerousness. See 18 U.S.C. §§ 4246-48. Furthermore, as Dr. Zula said at the November 30, 2010 hearing, in response to the Court's question whether the evaluation under § 4246 would be very different as opposed to § 4248: "I don't know about very different but they're not exactly the same. But we do look at

sexually dangerous behavior under 4246 . . . ."  Nov. 30, 2010 Tr. at 22:10-22:18 (Court, Zula).

The letter from Mr. McCue containing Dr. Newman's opinion on Martin's sexual dangerousness causes the Court to consider this issue carefully.  Dr. Newman stated that Martin was "so far from meeting the criteria for § 4248 commitment that it was ridiculous."  Letter at 1.  He also stated that he was confident that Martin would "screen out" for § 4248 commitment; in other words, that Martin would not be eligible for commitment on that basis, particularly given his specific mental problems of mental retardation as opposed to some other mental disease.  See Letter at 1.  On the other hand, the allegations against Martin are serious.  The Court must also consider the potential harm to the public that Martin might inflict if the Court too hastily authorizes Martin's release.  Taking into account that the Court cannot at this time impose any conditions on Martin's release also weighs in favor of an additional examination under 18 U.S.C. § 4248.  Releasing Martin under conditions may very well be the best option in this case, but the Court does not have the authority to do that at this time.   See 18 U.S.C. § 4246(d)-(e).  Cf. United States v. Stewart, 452 F.2d at 270 n.6 (stating in the context of conditionally releasing an insane defendant based on similar statutory language that conditional release was only appropriate after hospitalization and commitment under the earlier subsection in the statute analogous to §§ 4246(d) and 4248(d)).

Thus, despite the results of the Dr. Newman and Dr. Reardon's report, and the letter from Mr. McCue containing Dr. Newman's opinion, the Court nonetheless finds it advisable to order a separate report under 18 U.S.C. § 4248.  It is true that the report specifically indicated that, "Mr. Martin lacks a history of violent sexual behavior other than the alleged instant offense of Sexual Assault."  Sealed Forensic Examination at 8.  Nonetheless, the alleged offense involves violent sexual behavior, and it might be wise to have a panel of doctors focus exclusively on that aspect of dangerousness, and not all violent conduct.  The Court agrees with the United States' argument that

a psychosexual evaluation that would be part of an evaluation under 18 U.S.C. § 4248 might be helpful. While the lack of any history of violent sexual behavior for Martin indicated in the report may make it unlikely that a further evaluation would reveal anything new, see Sealed Forensic Examination at 8, given the sexual crimes here, the examiners' focus on that one aspect of Martin's makeup may reveal something the broader evaluation missed. Dr. Zula stated that the inquiries as part of each determination are not "very different," but they are "not exactly the same," in part because § 4246 examinations "do look at sexually dangerous behavior" to some degree. Nov. 30, 2010 Tr. at 22:10-22:18 (Court, Zula). Given Martin's incarceration for several years now, the cost of delay to him is substantial, but the additional examination will take place within forty-five days as required by 18 U.S.C. § 4247(b), and the delay will be relatively brief in comparison to the entire time that he has been in custody. The costs to Martin of ordering another evaluation under § 4248 do not outweigh the benefits that would be gained from the additional information the report might offer. The Court can adequately assess Martin's sexual dangerousness based on the new report and the other information before it.

The § 4248 examination seems particularly desirable given that the Court cannot currently release Martin on conditions. While Martin tries to mitigate the United States' and the Court's concerns about releasing him by saying the Court can impose supervised release conditions on him, the Court has been unable to find a source for such conditions. The Court cannot legally impose conditions on people who have been acquitted or have had the charges against them otherwise dismissed. The Court does not see a basis here to impose conditions. It may be that the doctors will recommend conditions on Martin's release, and the Court can then impose conditions, specifically "a prescribed regimen of medical, psychiatric, or psychological care or treatment," after the United States makes the required showing of sexual dangerousness. 18 U.S.C. § 4248(e). On the present

record, however, the Court cannot impose conditions.  This omission in the current record is another reason to have the § 4248 evaluation done.  To maximize the benefit to the parties and to the Court of the § 4248 evaluation, it would make sense to have a separate set of doctors do the evaluation. Precisely because the Butner doctors have done a thorough examination on the broader topic of dangerousness, there may be an inherent reluctance to find sexual dangerousness now.  The Court will then recommend that the § 4248 examination take place in Springfield, Missouri so that the Court and parties can have a timely independent, second evaluation.

IT IS ORDERED that: (i) the United States' Motion to Return Defendant for § 4248 Evaluation, filed November 24, 2010 (Doc. 50), is granted; and (ii) the United States' Motion for a Second Evaluation Pursuant to 18 U.S.C. § 4246, and in the Alternative, for an Evaluation Pursuant to 18 U.S.C. § 4248, filed July 12, 2011 (Doc. 57), is granted in part and denied in part. The court will not authorize a second examination of Martin under 18 U.S.C. § 4246, but will order an examination of Defendant Nathan Martin under 18 U.S.C. § 4248.  The Court recommends that the evaluation under 18 U.S.C. § 4248 take place at the Springfield, Missouri Bureau of Prisons facility.  The commitment period for examination must last for only a reasonable period of time, not to exceed forty-five days.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
  United States Attorney
Shana B. Long
  Assistant United States Attorney
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Stephen P. McCue
  Federal Public Defender
Federal Public Defenders Office
District of New Mexico
Albuquerque, New Mexico

    *Attorney for the Defendant*